Case number 21-5987, Jaimie Rager v. McMinn County, Tennessee, et al. Oral argument is not to exceed 15 minutes per side. Mr. Taylor for the appellants. I think I just called the clerk counsel. I apologize for that, for the clerk. I might feel more comfortable in a different position. Good morning, your honors. May it please the court, counsel. My name is Jonathan Taylor. I'm of the Knoxville Bar Association. I'm here today representing the defendants or the appellants, McMinn County, Tennessee. Officer, corrections officer, Derek Sachs and Sheriff Joe Guy, who is respectfully requesting that this court reverse the district court's denial of qualified immunity. And to also find that the claims against McMinn County, Tennessee are inextricably intertwined with those against the individual defendants. At this time, appellants respectfully request five minutes for rebuttal time. I'd like to start by acknowledging the uniqueness of this case from the standpoint of the district court's opinion in this case was issued in October of 2021. That was before this honorable court changed or at least refined the standard as it relates to failure to protect claims under the 14th amendment in the Westmoreland versus Butler County, Kentucky case. As to the first issue, the district court erred in denying qualified immunity to Derek Sachs because there was no intentional act on the part of Officer Derek Sachs. In this context, it's undisputed in the facts that Derek Sachs was not even on duty at the time that Mr. Cook and Mr. Jones were placed in a holding cell outside of booking. Again, another very important undisputed fact is that neither of these two inmates had been booked in or even classified by the correction facility, which of course occurs at the time of booking. So these two gentlemen have just been arrested, put into a holding cell together, and Derek Sachs is not even on duty at this time. It's undisputed that Derek Sachs did not make the decision to place these two gentlemen because of course he was not on duty at that time. He did not place these two gentlemen into holding cell number one. More importantly, it's undisputed that Derek Sachs had no recollection of these two gentlemen being placed into the cell before this incident. Again, he's sitting at a table or a desk outside of this holding cell and his first knowledge as he testified was that when he first learned of an incident was at the time that this altercation occurred. It was a very quick altercation. Did he have any ability to deviate from what I understand... Let's back up for a minute. I understand everybody concedes that Sheriff Guy had a policy, the clean start or fresh start policy. Did he have any authority to break that policy and separate the two of them? He did, at least based on the testimony of Joe Guy. Joe Guy, Sheriff Guy testified that the policy is a fresh start until there is a reason to deviate from that. Meaning there's combativeness. He could separate them once he saw fighting. No, it's a little more refined than that. It is in the context of combativeness. There was nothing in the record that suggested that Mr. Jones, the attacker in this situation, was combative or aggressive. He did not resist arrest. He came in on a very small property offenses. Nothing to suggest that there was some aggravation or issues. So under the facts as you've just stated them and under the policy, Officer Sachs, there was nothing he could do until he saw some kind of aggression, some kind of combativeness or actual violence. Right, until he had reason to appreciate and to understand and appreciate this aggressiveness or combativeness. That could have occurred in the course of booking, right? We don't even have none of these officers. And again, these are not choir boys, right? They don't get a choice as to who comes into this jail on a daily basis. There are a lot of law enforcement agencies within this county that feed these inmates into this system. And once they get taken there, they have to do something with them, right? And a part of that process is booking. And in the booking process and classification, that's where we start looking at prior offenses, prior discipline, all that sort of stuff. Can we talk about, instead of talking about Officer Sachs right now, can we talk about Sheriff Guy? So these two inmates had been in an altercation in this jail like 20 days earlier, 19 days earlier, something like that. No, your honor. Oh, not these two inmates. That's right. The assailant assaulted somebody else. Correct. Sorry. That's correct. Okay. That is Jones. Jones assaulted someone else. Yes. 19 days earlier. So did that put Sheriff Guy on notice that Jones was likely to be dangerous again? Again, no. From the standpoint of, we don't know what these people come in on. Maybe they're high on drugs. Maybe there's some reason for this outburst or combativeness or aggressiveness. Nothing about this incident. For one thing, Jones and Cook knew nothing of each other. Cook had never been in this facility. While I acknowledge and admit that the facts clearly show that Mr. Jones had been in this facility some 15 plus times before this incident, he had served over 900 days, which is clearly reflected in the record. Each booking sheet shows how long they were incarcerated for. In this context, if you add them all up, it was 942 days. Out of that 942 days he had served in this facility, only five times had there been some prior discipline. Again, I'm not here to suggest that there's not... Five times out of 942 days, but that's not 942 incidents of booking. No, but 942 days this gentleman was a known quantity to McMinn County. That's what the record shows and clearly reflects that. 942 days of incarcerated time did Jones spend in McMinn County Detention Facility. How is putting him... Somebody comes in, you know he's been assaulted before. Why is putting him in a different cell or turning the lights on... Why is that discipline? Why is that not giving him a clean slate? You're saying to move him to a separate cell immediately... You have a bunch of cells. A guy comes in, everybody knows he sometimes goes a little nuts. Why not just put him in a different cell? Why not care about protecting the person who's in the cell or turning lights on? In this context, again, no dispute about the fact that there were open cells. That's undisputed. In this context, sure, there's only two people in this cell at this time. The day before, the week before, there may be 10. There's not enough holding cells for individual cells.  In segregated... Okay, I'm sorry. You have a situation where there is knowledge that this man becomes assaultive. Not every day. Maybe five times out of whatever. But you have a potentially assaultive individual. You have other cells. I understand the policy of not penalizing somebody for their prior acts, but I don't understand how this is penalizing him or having him come in with not a blank slate on his discipline. It's simply being responsible. The way I would respond to that, Your Honor, is that in this context, he's not a known quantity at this time. Again, he's brought to this facility by a separate deputy officer, and he's put into a holding cell to go through the process. That's where the process is discovered in the terms of combativeness, classification. That's where you get into, okay, do you have prior issues with... Okay, come on. You have somebody... I'm going to give you a hypothetical. If you have somebody who is known to the jail, and every time he comes in, he gets into a fight, hypothetically, and they just know, Joe's here, he's going to be attacking someone. You still put him in that room until you go through the process? You're not the least bit proactive to see that he doesn't beat another person up? Your Honor, I think in that context, absolutely not. I'd be a fool to stand up here before you and suggest that that's what you do. You still put him. A known quantity that gets into a fight every time he comes into this facility is not going to be placed into the same spot with other inmates. I thought that was the policy. I thought it was a clean slate policy, that the only time you could deviate from the clean slate policy is if the inmate shows violence or combativeness during the booking process. Otherwise, no. Well, if somebody has been in and out of this facility 15 times, and every time they come into this facility before booking even occurs, I'm assuming then that the policy is different. So you're saying the constitutional line is 5 versus 15? It's 5. Only one of these incidents occurred during booking. The other incidents were during the 942 days that he was incarcerated in McMinn County, Tennessee, in this detention facility, in other populations, general population, other holding cells, other pods, systems like that, with other inmates. Some of these incidents, if you look at the incidents, not all of these are physical altercations. Some of these five incidents are verbal altercations. That's where we're talking about discipline. A verbal altercation doesn't even count. It shouldn't count as a strike, and it should not stand for some premise that in this facility they should automatically be segregated upon coming into this facility. That's an untenable position based on the constraints and the realities in a jail and a detention facility that doesn't have unlimited amounts of individual cells. Going back to the facts, they were both in the cell before he came on duty or before he knew about them? Before he came on duty and before he knew about them. That's what he testified to. Then in terms of when he came on duty, is part of acquainting himself with what's going on in the jail that day, looking and seeing, well, who do we have, where are they, and all the rest? I'm not suggesting that there should not be some checking in that regard. The reality is, however, the clear record before this court is that he had no knowledge of these two being in this holding cell together prior to the altercation. So if he had no knowledge of it, how in the world could he have anticipated this or prevented it in this context? And just to clarify, when we're talking about he, we're talking about... We're talking about facts. Yes, Your Honor. Well, obviously something different could have been done because there was empty cells. But the question is, does he get saved by the policy, really? Because putting people together was the rule rather than the exception. That's right. And particularly in his case where he comes on duty after the people are in there, if he saw two people in the same cell, it would be consistent with the sheriff's policy, at least not against it. That's correct. Seeing that my time has expired, Your Honor, I'll save the rest of my argument until rebuttal. Thank you so much. Police and the Court, I'm John Cabot from the Chattanooga, Tennessee Bar. I'd like to begin by addressing, maybe tightening up some of the facts, some of which I disagree with. The situation is that Mr. Jones had been incarcerated on 15 occasions, and on six of those, he had been in a violent confrontation with another inmate. I don't recall any of the incidents being solely verbal. They were all characterized as attacks. Apparently, four of them had occurred in general population. One of them had occurred in the booking cell 19 days prior to this incident. Officer Sachs is the supervisor of the jail for that shift. He was the supervisor on duty at the time of the December attack, when Mr. Jones was placed in a cell in the holding area with another inmate. Next to that cell are four empty cells, literally separated by bars, maybe a wall. They're lined up right together. On both the December incident and the January incident that we're here about, none of those cells had anybody in them. So these two prisoners were put together in a cell when there was an empty cell literally feet away. But Officer Sachs didn't put them in the cell together. He did not put them in the cell together, but he arrived in the booking area before the attack. He was sitting in the booking area at the time of the attack. He couldn't see in the cell because they turned the lights off for some reason, or he couldn't see very well. But he was able to eyeball this altercation. He was talking with another officer. The other officer said, hey, you've got to fight. And they ran like crazy to the cell to get these people separated. And before they could do so, Mr. Jones had Mr. Cook on the floor and was kicking the life out of him literally. That's incredibly tragic. But it also sounds like Officer Sachs responded as soon as he knew something was wrong. He ran like heck to break up the fight. Right. So the question is, did he have a duty to separate them before they got in a fight and saved this man's life? Wasn't there a policy that prevented him from doing so? There was a policy that prevented him from doing so. It's this clean slate policy. Great. We can talk about the problem with the policy, but there's two different questions. There's the policy, so that's the sheriff's liability in his official capacity. And then there's the Officer Sachs who has to follow the policy. So can we hold him liable for failing to break the mandatory policy? Yes, Your Honor, you can. And what's the authority that you have for that? We had a duty to do that under the Constitution. Under the Farmer case, the courts have said that officers in a jail have a duty to protect inmates. So the question would be, is he excused from performing his constitutional duty because of this unconstitutional policy? I believe not. Do you have a case that stands for the proposition that a subordinate is constitutionally required to break a mandatory policy? I don't know that I have a case at hand on that, but what I think is important is that, on the other hand, I'm not aware of any case that says someone's constitutional rights are dependent upon whether some officer obeys an unconstitutional policy. I mean, common sense, it seems. Well, maybe the policy is a problem. The policy is a problem because you can have a person that comes into the jail, he's been there on five different occasions and has attacked other inmates. He attacked an inmate in the same cell in the same situation 19 days before. So my adversary's reading of the clean slate policy seems to be that you don't worry about an inmate no matter what you know about him when he is first brought into the jail until he acts violently at that time. And to say that you're going to follow a policy where Officer Saxe knew this defendant, this is a county jail in a somewhat rural county, and he had been present when the other attack had occurred. So I believe he had a constitutional duty under all the cases, and I do believe he should have broken that policy, and I believe if he had, Mr. Cook would not be dead right now. Do you concede that he would have broken the policy by just moving him next door? It's hard for me to see how that's discipline. I don't. I would argue that if the policy, the problem with a policy is that it only allows you to look at from the time this person came in the door forward. It doesn't allow you to protect somebody that you know is going to be violent. So you agree that the policy forbade Officer Saxe from moving Jones, the violent inmate, to another cell based on the policy? You say the policy is bad, but... Yes, I think for all we know, the policy is enunciated by the author of the policy, who is the sheriff, and by example, somebody shows us that they're violent, we're going to treat them as if they aren't, and the problem is all this past history of this guy is not put into the equation under the way they understand the policy. Let me ask you this. Does the record show that Saxe, who wasn't there at the booking or anything, that he was aware that it was Jones who was in the cell before the altercation occurred? Yes, he knew it was Jones in the cell. He saw him. You know, this guy 900 days in the jail, this is not a big jail, and he knew about Jones' past incidents. He knew Jones was a violent person. He wasn't allowed to do... He knew Jones was in the cell with... Yes, Your Honor, he did know that. What are you basing this on? Because you said it was dark. He's sitting there, he's looking in a cell, he can't see. It was in the dark, but the cells are lined up on the side of the area. Out in the main area, it's very, very light. The district court judge seemed to be impressed by the fact that the cell was dark. I never saw that as being the biggest issue in the case, but Saxe was sitting in that room not much farther than I am from you, maybe from here to the corner, and he definitely knew they were both in the cell, and he felt like the policy required him, I guess, to leave them there. Is that in the record the way you just stated it, or is that an assumption based upon proximity and whatnot? In a deposition or in some form, did Saxe say, I knew that Jones was in that cell before the fight broke out? I took his deposition, I can't quote the book and page, but it's my recollection he certainly did, and he's never contended that he didn't. He knew Mr. Jones, they all knew Mr. Jones, and he knew he was in that cell. Well, the other thing that runs through this is the so-called fresh start program. If the person has no record, then fresh start isn't implicated. By definition, the fresh start program applies to people who have had previous problems. Well, I mean, it applies to everybody, because if you've never had previous problems, then you're going to be treated as if you're not going to be a problem until you... But you missed my point. The very name of it, the fresh start, if you've never been in jail before, you don't need a fresh start. No, you don't. They're external to the policy. Absolutely. So the fact that someone may be booked that they know has been a problem in the past, those are the cases where there's more history to even be considered a fresh start person, right? I agree 100%, and I can't imagine a case where there's more history of how violent this Mr. Jones was. Again, the policy, it was almost inevitable, almost, that something was going to happen. And it just doesn't make common sense. If there's a prisoner in here, we're going to treat him like he's not going to be a problem, even though we've seen him kick the heck out of people five or six times in the past. And the scary thing to me is that there wasn't any pattern to his attacking other people. It wasn't... Let me ask, did Sheriff Guy, is there evidence that Sheriff Guy knew about Jones' past checkered violent tendencies? And did he need to know for your failure to protect claim? Did he need to know this particular inmate is likely to cause a problem? Yes, he knew that, and he had records. When I took his deposition, he had the records with him of Office of Mr. Jones' past disciplinary actions. And again, this past history of Mr. Jones, those are the occasions where he was formally disciplined under their other policies for attacking an inmate. And we don't know if he was violent on other occasions, but there were serious enough attacks that there were just official disciplinary actions taken against him. Did Sheriff Sachs know before the altercation that Jones was in the cell with somebody? Sheriff Sachs. I'm sorry, Sheriff Guy. How could I miss that name? Did he know that Jones was in the jail in the cell? Did the sheriff know? I don't know that he did. He wasn't there that day. He's being held responsible for the policy basically that he created. I understand that. No, he wasn't there. He wasn't there that day. And with respect to Sheriff Guy, is your claim against him in his individual capacity, or is it effectively against the county? It's in his official capacity. So it is against him in his official capacity, but it is essentially part of the claim against the county. Of course in Tennessee, the sheriff is an elected official and he is by statute responsible for the county jail. Runs it, makes the policies. Did Guy testify that Sachs had no choice but to put him in the same cell? Did who testify to that? Did Sheriff Guy testify that Sachs had to put him in the same cell? I don't recall if he used those exact words, but he attributed the incident to obeying the policy and did not feel frankly, and certainly did not state that anything that had happened in this case was going to change his mind about the policy. I don't remember the exact language, but he volunteered the policy. I didn't know it was the policy when I took his deposition. He said we have a policy here. And he did not ever say there should be an exception to it. Sachs should have known that the constitutional rights, the duty to protect this guy trumped this policy. Nothing like there was no apologies for it whatsoever, even after all these events occurred. On your failure to train claim, you have a failure to train claim against Officer Sachs. I'm confused by that because I'm not quite sure who he failed to train. I didn't state that right. I think that's a claim against the Sheriff and the County. Sachs wasn't responsible for it. If I did that, that's not the basis. So you're abandoning a failure to train claim against Officer Sachs? Against Officer Sachs. It doesn't matter. We know who you're talking about. I've got 20 seconds, so I'll sit down unless you have any further questions. Is it important strategically to have Sachs still in the case? Strategically? I'd rather have him there than not. He has different circumstances, and I think you put your finger on them, or you all did, that he was following this policy and that he was required to follow it. I believe he deserves to be in the case. I don't think following a policy that, at least in its application, is unconstitutional is excusable because it's a policy. Isn't there a lot of case law that says that it is? We seem to have cases that say various officials are not deliberately indifferent when, even though they knew of certain things, they followed the prison's policy. It's not reckless behavior to rely on a department guideline. In my opinion, it was extraordinarily reckless behavior not to separate these men. And again, I do understand, and I do admit or concede or state that he was following the policy. It's almost like an illegal order in the military. I think when you have a constitution, you walk in the jail, you see those two guys together, you were here 19 days before when there was this violent confrontation in the very cell, then I think not only the decent thing and the reasonable thing, but the constitutional thing to do is to separate them. I have one other question triggered by your comments relative to the failure to train claim. Guy was denied qualified immunity on a fail-to-supervise-and-or-train claim. Are you saying that you're not defending that denial, asked Sheriff Guy? I believe Sheriff Guy is certainly responsible for failing to train. It's an interesting flip of a question, though, because usually, I mean, I'm sure almost always, that issue comes up in the context where there's a rule that says you're supposed to do that and the officers don't know it. What training, where is the failure of training? What training should have been given? Again, it relates to something I've been arguing this morning, but I think to require in training an officer to obey that rule with no exceptions whatsoever is at least improper training. Isn't that just an attack on the policy itself rather than a failure to, I mean, what's the distinction between that and the, I perfectly trained you on this policy that you claim is unconstitutional. I should have trained you on a different policy. Aren't those the same things? I don't have a case, but I think that to train an officer to obey an unconstitutional policy is tantamount to a failure to train. It may not be, but I believe it is. That's my argument. Any more questions? Let me ask you one more thing. Did you mediate this case? Did you go to mediation before coming to it? We got put in that bin, but it did not happen. We have a pretty good mediation office here. No, that was something I favored, and we had a mediator appointed, and we talked about it, and I don't know whether I should say why. I don't want to hear why. I'm all for mediation. We're talking about court mediation here, the one we had. Somebody from the Sixth Circuit, I've forgotten her name very nicely, called me, and we started that process, and she was going back and forth and eventually said this isn't going to work. Thank you. Just to follow up on that, as it relates to the failure to train, there's nothing in the record that suggests that there's anything identifiable as it relates to the failure to train. That's inherently the issue, and of course the court, the district court, didn't make a ruling on qualified immunity as it related to the failure to train claims. And of course, as I understand, Postal Council, they've abandoned this morning their claim against Sachs, because of course he's not a supervisor that would have even come within the purview of a failure to train claim, because he wasn't a policymaker. As it relates to some of the other things that this court inquired about, Postal Council acknowledged that there's no pattern or custom or any anticipation as it relates to this disciplined behavior on the part of Mr. Jones. He noted that there's no rhyme or reason to some of these attacks that have occurred in the past. And again, as it relates to some of the facts and discipline... If you had the most notorious violent person in your county, I'm sorry, I don't know which county. We're in McMinn County. So there's public enemy number one, and he's always getting into brawls. And you know it. The policy would say, fresh start. Fresh start unless during the booking process he exhibits violent or combative behavior. That's correct. That is what the policy says. Isn't that kind of reasonably foreseeable that it's probably going to happen when you put him in a cell with other people? Well, and again, the one way I will distinguish this is we don't know who these people are until the booking process. And again, I'd be remiss to... You know, because the guy's a repeat player in the criminal justice system in McMinn County, which isn't that big. If Cook was the most notorious inmate in McMinn County and he came into that facility and he was in trouble every time, yes, I would agree with you. But that's not the facts here. What we have in this context is... But that is the policy. So now you're saying no, we would break a policy? No, I'm saying that under your scenario and under the example and the hypothetical that we talked about during the first part of my argument. In that context, if every time this inmate comes in, he's combative, I think that's a different scenario. I mean, again, this is a hypothetical. I'd be foolish to stand up here before you and suggest to you that that would not be something that should have some thought to it and accommodation. But I'm sorry, maybe I just misunderstand, but I thought that both sides agreed that the policy is no exceptions unless the individual exhibits violent or combative behaviors during the booking process. Otherwise, you go in the same cell, you go in the gen pop, right? You go in... I know we're talking about a holding cell, but that's the policy. But now you're saying, oh, well, if you were really public enemy number one, then we would break the policy. So what's the policy? Are there exceptions or not? Well, clearly, okay, the policy and the custom as testified by Sheriff Guy in his deposition, and this is at 395 through 96, if a person came in and was cooperative, we're going to treat them as a cooperative inmate, regardless of what they might have done in the past or what they were even charged with. But yes, if they cross that line and they're not compliant, if they show literally physical anger or aggression to the staff or another inmate, then we're going to separate them and take action there. I'm not going to waver on that. That's what the record reflects as the policy. That is what Sheriff Joe Guy testified to. That is his policy, whether I like it or not. Having said that, in this context, as it relates to Mr. Jones, the important part is, again, this is not somebody that had even been booked into the facility. All of the cases that I have been able to review and look at in this context, all of these inmates are folks that, based on their behavior in the course and scope of their current incarceration, they exhibit some discipline problems. That's not the context here. Well, it's not tied down precisely, but it's not more than an hour or so or a few hours at most. I'm a little confused by this booking process. You say they hadn't been in that cell? You had no idea who the two persons were that were in that cell? Certainly, McMinn County was aware that Jones and Cook had been brought in by those agencies. They had turned over, as it relates to custody and control, they had turned over those law enforcement agencies that brought them there. One was the City of Athens and one was McMinn County. So you knew, whether you say they hadn't been booked or whatever, you knew who was in that cell? That's right, but we don't know about discipline. As a part of just knowing somebody is in there, not every one of these officers, multiple officers work in this jail facility at any single time. And Sachs wasn't on shift at the time that either of these two gentlemen were brought in, and certainly was not on shift at the time both of them were placed into the single cell. But he was on shift when he was sitting in the center and he was looking around and he saw who was there. No, the testimony as opposed to counsel acknowledged, lights are off. There's nothing in the record that suggests that Sachs was affirmatively aware and nothing in any of those deposition transcripts that are before this court that precisely identifies the moment that Sachs acknowledged and knew that Cook was in a jail cell or in a holding cell with another inmate. He said he didn't remember. And we can't take that and flip that and make it into something else. But you do have the physical layout of the jail. Is it incorrect that he would be about this distance from the cell? That's not in the record. The precise physical layouts, there's no diagramming. I'll concede to you I've been in that facility and it is farther away than me from you, Your Honor. But again, that's not before the court. Acknowledging that my time has run short on me again, Your Honor, I would respectfully request that this court reverse the district court and find that Officer Sachs is entitled to qualified immunity, the same as it relates to Sheriff Joe Guy, and that this court reverse the claims. Counsel, before you conclude, I'm going to ask you the same question I asked your opponent. Have you considered the possibility of mediation in this case? I haven't, Your Honor, and I'll concede to you on this. Another attorney in my office had primarily handled the defense of this case, who has now left our firm, and so I've drawn the dubious distinction of appearing before you today and taking over this case in a supervisory capacity. I'm always amenable to mediation. I don't know what happened in the prior mediation. I understand there was a mediation, but I'd like the opportunity to discuss that with opposing counsel. Well, perfect. We have a mediator's office, so sometimes the panel will just facilitate that by contacting our mediation office, and then if you want to proceed on that track, that is up to the two of you.